# STATE OF MICHIGAN

# COURT OF APPEALS

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MARTEZ CLEMONS,

       Defendant-Appellant.

UNPUBLISHED
January 22, 2015

No. 313074
Wayne Circuit Court
LC No. 12-004371-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MARTEZ CLEMONS,

       Defendant-Appellant.

No. 314335
Wayne Circuit Court
LC No. 12-004371-FC

---

Before: MURRAY, P.J., and SAAD and K. F. KELLY, JJ.

PER CURIAM.

In this consolidated appeal, defendant challenges his convictions and sentences arising out of two criminal trials. In Docket No. 313074, defendant appeals as of right his jury trial conviction for first-degree home invasion, a violation of MCL 750.110a(2), for which defendant was sentenced to 75 months to 30 years' imprisonment. In Docket No. 314335, defendant appeals as of right his jury trial convictions for assault with intent to do great bodily harm less than murder, a violation of MCL 750.84, and six counts of first-degree criminal sexual conduct (CSC-I), a violation of MCL 750.520b(1)(c) (sexual penetration occurs under circumstances involving the commission of any other felony), for which he was sentenced as a second habitual offender, MCL 769.10, to concurrent sentences of 356 months to 45 years' imprisonment for each of the six CSC convictions and 6 to 10 years' imprisonment for the assault conviction. Finding no errors warranting reversal, we affirm defendant's convictions and sentences in both cases.

## I. BASIC FACTS AND PROCEDURAL HISTORY

-1-

At defendant's first trial, he faced charges of first-degree home invasion, assault, and multiple counts of CSC-I upon allegations that he assaulted 55-year-old PL in her apartment, which was located in the basement of an apartment complex. The jury at defendant's first trial found defendant guilty of first-degree home invasion, but was hung as to the remaining counts alleging assault and CSC. Therefore, a second trial was held on an amended information, which alleged the assault and CSC counts.

The evidence at both trials was substantially similar. PL testified that she woke up in the early morning hours of April 4, 2012 in order to self-administer a shot for her diabetes. A man kicked in her apartment door. He declared that PL owed him money. When she refuted that statement, he then hit PL in the face, knocking her to the ground. He hit and kicked her and then proceeded to sexually assault her. The man then passed out on her bed. PL grabbed some clothing and fled to a nearby gas station for help. She also retrieved two "roses," which PL testified were crack pipes that fell from the man's pants. Although PL identified defendant as her assailant at both trials, the parties stipulated that PL selected an individual other than defendant from a live lineup held.

A maintenance worker saw that PL's apartment door had been kicked in. There was a man passed out on the bed with his pants down around his ankles. Spots of blood were also found in and around PL's apartment and the back door of the apartment complex. The apartment manager called 911. Police officers found defendant sleeping in PL's bed. They woke him up and asked him to pull up his pants and sit in a chair. Defendant told the officers that he had been in the apartment with his friends – Sandra and Jay and that the "old lady" was there when he fell asleep. The officers called dispatch to determine whether any assaults had been reported. Dispatch told the officers that PL had been to the hospital on claims of sexual assault. The officers located pill bottles with PL's name on it and confirmed that it was her apartment. They placed defendant under arrest.

PL underwent a sexual assault examination. She had lacerations and bruises to her face, knee, hip, and groin. There were no injuries to PL's genitalia. The nurse collected samples from PL's cheek, rectum, vagina, and breasts. There was no seminal fluid or sperm cells present on PL's vaginal, anal, rectal or oral swabs. The swab of PL's left breast revealed DNA from PL and one other person who could not be identified. The swab of PL's right breast revealed DNA from PL and two others. Defendant could not be excluded as a donor. The two "roses" contained DNA from two donors, but it was impossible to identify the donors. Neither PL nor defendant could be excluded. The glass vials did not contain usable fingerprints. Essentially, there was no DNA evidence connecting defendant to PL.

At both trials, the prosecutor introduced evidence of an assault that occurred prior to the assault on PL. Arthur Rucker was a homeless double leg amputee who periodically slept on the inside of the apartment complex's back door. On the same night PL was assaulted, Rucker was approached by defendant, whom he recognized from the streets but did not know personally. Defendant demanded that Rucker pay him the money that he was owed. Rucker denied that he owed defendant any money, whereupon defendant began to punch Rucker in the face, knock him

-2-

to the ground, and beat him. The beating stopped when Rucker's friend, Gerald Jones, came to the scene.[1] Rucker suffered serious injuries and was hospitalized. Like PL, although Rucker positively identified defendant at both trials, Rucker chose an individual other than defendant during a live lineup.

Defendant was convicted and sentenced as previously stated. He now appeals as of right.

## II. BAD ACTS EVIDENCE

In both appeals, defendant argues that the trial court abused its discretion when it permitted the prosecutor to introduce "bad acts" evidence because the evidence was used solely to suggest that defendant had a propensity to assault handicapped individuals. We disagree.

"The decision whether [bad acts] evidence is admissible is within the trial court's discretion and will only be reversed where there has been a clear abuse of discretion." *People v Crawford*, 458 Mich 376, 383; 582 NW2d 785 (1998). "An abuse of discretion occurs only when the trial court chooses an outcome falling outside the principled range of outcomes." *People v Miller*, 482 Mich 540, 544; 759 NW2d 850 (2008) (internal quotations and citations omitted). However, preliminary questions of law are subject to de novo review. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). "Close questions arising from the trial court's exercise of discretion on an evidentiary issue should not be reversed simply because the reviewing court would have ruled differently. . . . The trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998).

At defendant's first trial, the trial court ruled that evidence of Rucker's attack was relevant to show both identity and common plan or scheme. The trial court looked to the fact that, in both attacks, defendant claimed that the victims owed him money and then struck them in the face when they denied it. The trial court also looked to the fact that both assaults occurred in the same apartment complex very close in time to one another.

On the first day of defendant's second trial, defense counsel asked the trial court to reconsider its previous ruling. Counsel argued that the incident with Rucker was "[n]ot a sexual assault in any way and our position is that that is clearly more prejudicial than probative on the issue of the sexual charges particularly in view of the fact that the breaking and entering is no longer an issue in this case." The trial court declined to revisit the issue on those grounds, finding that the fact that defendant "was convicted of that one count doesn't change anything."

On appeal, defendant argues that the evidence of Rucker's attack should have been excluded at both trials.

---

[1] Jones testified at defendant's first trial but did not testify at the second trial. The trial court gave the jury and adverse inference instruction, advising the jury that it could infer that Jones' testimony would have been adverse to the prosecutor's case.

MCL 768.27 provides:

> In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved, whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant.

Additionally, MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In order for "bad acts" evidence to be admissible: 1) it must be offered for a proper purpose; 2) it must be relevant; 3) the probative value of the evidence may not be substantially outweighed by unfair prejudice; and, 4) that the trial court may, upon request, provide a limiting instruction to the jury. *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993) amended 445 Mich 1205 (1994).

A "proper purpose" is one other than establishing the defendant's character to show his propensity to commit the offense. *VanderVliet*, 444 Mich at 74.

> Evidence relevant to a noncharacter purpose is admissible under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule only if it is relevant solely to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. [*Mardlin*, 487 Mich at 615 (emphasis in original).]

"Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Evidence that is otherwise relevant "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403; *People v Mann*, 288 Mich App 114, 119 n 12; 792 NW2d 53 (2010).

Defendant argues that the evidence was inadmissible to prove identity because there was nothing uncommon or distinctive about the two assaults. It is generally true that, when

-4-

introduced to establish identity, the prosecutor bears the heavy burden "to show that the manner in which the crime charged and the other crimes were committed was marked with special characteristics so uncommon, peculiar and distinctive as to lead compellingly to the conclusion that all were the handiwork of the defendant because all bore his distinctive style or 'touch'." *People v Golochowicz*, 413 Mich 298, 325; 319 NW2d 518 (1982). However, while this case may be missing the hallmark distinctive style, identity was relevant because of the proximity in time and location of both assaults.

As far as scheme or plan, "evidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system. " *People v Sabin (After Remand)*, 463 Mich 43, 63; 614 NW2d 888 (2000). The charged act and the prior bad acts do not need to be "part of a single continuing conception or plot" for the prior bad act to be relevant. *Id.* at 64. "Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." *People v Sabin (After Remand)*, 463 Mich. 43, 63; 614 NW2d 888 (2000) quoting with approval *People v Ewoldt*, 867 P 2d 757 (1994). In contrast to identity, prior bad acts offered to prove a pattern or practice are subject to a lower requirement of distinction or uniqueness, and acts offered to prove intent require even a lesser degree of similarity. See *People v Smith*, 282 Mich App 191, 195; 772 NW2d 428 (2009) ("A high degree of similarity is required [to show a pattern of conduct]—more than is needed to prove intent, but less than is required to prove identity—but the plan itself need not be unusual or distinctive.")

The prosecutor used Rucker's assault to demonstrate that defendant had a common scheme or system in carrying out the attacks. First, defendant located a vulnerable victim. Second, he approached the victim with an accusation that he or she owed him money. Third, when the victim professed that no money was owed, defendant struck each about the face and eyes with his fists. Thus, evidence that Rucker was attacked in a similar way just moments before PL was attacked was probative of the identity of PL's assailant.

Defendant suggests that the prosecutor's proffered reasons for admitting the bad acts evidence was a mere ruse and that the evidence was *solely* intended to suggest that defendant acted in accordance with a propensity to assault handicapped persons. A "prosecutor deprives the defendant of a fair trial in arguing that the jury should consider the evidence as substantive evidence of the defendant's guilt." *People v Quinn*, 194 Mich App 250, 253; 486 NW2d 139 (1992).

However, the prosecutor was careful to frame her arguments in a manner consistent with the law. She did not ask the jury to convict defendant because he was a bad person; instead, she sought to dispel any doubt in the jury's mind that defendant was not PL's assailant. This was an appropriate response in light of the fact that neither PL nor Rucker chose defendant from live lineups. Thus, identity was an issue for trial and evidence of Rucker's attack was offered for a proper purpose.

Contrary to defendant's arguments, the probative value of the bad acts evidence in both trials was not outweighed by the danger of unfair prejudice. MRE 403 provides that relevant

-5-

evidence "may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the probative value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909, mod 450 Mich 1212 (1995). "The determination whether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility, and effect of the testimony." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009).

Here, the proffered evidence was not of marginal value, but was highly relevant to identity. The relevance of the bad acts evidence was established "through similarities between the charged and uncharged acts, rather than on defendant's character, as shown by the uncharged act." *Sabin*, 463 Mich at 63-64 n 10. Additionally, the trial court took great pains to properly instruct the juries in both trials as to the limited nature of the evidence. Therefore, any danger of prejudice was minimized by the trial court's instructions to the jury that it could not use the evidence to conclude that defendant was a bad person or that he had the propensity to commit the charged crimes. Jurors are presumed to follow their instructions. *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

Finally, defendant has failed to show that any error in admitting the bad acts evidence was outcome determinative at either trial. *People v Knapp*, 244 Mich App 361, 380-381; 624 NW2d 227 (2001). Defendant was found naked and unconscious in PL's apartment. The apartment door had been kicked in.

Because evidence of Rucker's attack was relevant to identity and scheme and was not outweighed by unfair prejudice, the trial court did not abuse its discretion in permitting the prosecution to present evidence that Rucker was attacked at nearly the same time, place, and manner as PL.

### III. AMENDMENT OF THE INFORMATION

In Docket No. 313074, defendant argues that the trial court erred in allowing the prosecutor to amend the information on the day trial was set to begin to add four counts of penile/genital penetration. We disagree.

> A trial court's decision to grant or deny a motion to amend an information is reviewed for an abuse of discretion. The trial court abuses its discretion if the result is so contrary to fact and logic that it evidences a perversity of will, a defiance of judgment, or an exercise of passion or bias or when an unprejudiced person, considering the facts on which the trial court acted, would say there was no justification or excuse for the ruling. [*People v McGee*, 258 Mich App 683, 686-87; 672 NW2d 191 (2003) (internal citations omitted).]

Prior to defendant's first trial, the prosecutor raised the issue of amending the information. The following exchange took place:

MS. WEINGARDEN [prosecutor]: The complainant in this case is developmentally delayed. She's an adult woman developmentally delayed. She told the nurse who will testify that she was raped orally, vaginally and anally. By the time we got to [the] preliminary exam she said she was raped orally and anally, not vaginally. So the vaginal penetration counts got dismissed. I did the pretrial interview with her last week. And now she's saying she was raped orally and vaginally, but not anally. So I'm moving to amend the information, the anal penetration counts, there are four of them presently, to add additional counts of vaginal penetration. I'm going to ask your Honor to instruct the jury that they must be unanimous as to their theories on any one of the penetration offenses.

\*\*\*

So what I've done is, I made count four is anal penetration. Count five is penis and genital opening. Count six is anal, count seven is penis and genital opening. Count eight is anal. Count nine is penis and genital opening. Count ten is penis and genital opening. Count 11 is penis and anal opening. So the jury would have the option of deciding which crevice he put it into, but they would have to be unanimous as to each count.

\*\*\*

THE COURT: All right. And so now you say she says that it was anal penetration and not vaginal penetration?

MS. WEINGARDEN: No. Other way around.

THE COURT: Other way around?

MS. WEINGARDEN: Right. He came from behind, but put it in her vagina she says.

\*\*\*

THE COURT: All right. So how many separate acts of penetration are alleged?

MS. WEINGARDEN: So we're alleging two oral/fellatio, and four either anal or genital.

\*\*\*

THE COURT: And the jury would be instructed that they would have to be consistent – or they would have to be unanimous as to which theory four or five, or six or seven, or eight or nine, and ten or eleven, okay.

And the reason – well, the reason for moving to amend it now as opposed to subsequent to the proofs?

-7-

MS. WEINGARDEN:  Is to put defense counsel on notice.

Defense counsel strenuously objected, noting that such an amendment would make the district court's ruling "a piece of crap and worthless."  The trial court clarified:

THE COURT:  Okay, thank you very much.  Two questions.  If I understand correctly, since there – you're adding four alternative counts, there is really no more counts – or he couldn't be convicted of any more counts now than he was on the second amended information, is that correct?

MS. WEINGARDEN:  Correct.

THE COURT:  The only thing you're doing is changing your theories as to four of those counts for different – as to add, whether it be genital – I'm sorry, vaginal or anal?

MS. WEINGARDEN:  Correct.

THE COURT:  And the statute on criminal sexual conduct in the first degree simply talks about sexual penetration.  It doesn't limit in the statute as to what manner that sexual penetration occurs, is that correct?  Because sexual penetration is defined in [MCL] 755.28 to include sexual intercourse, fellatio, anal intercourse, or any other intrusion however slight of any part of a person's body or any object into a genital or anal opening, is that correct?

MS. WEINGARDEN:  Correct.

THE COURT:  Okay.  All right.  The court is going to grant the prosecution's motion to amend the information.  The statutes allow amendment of the information at any time before, during or after to conform with the proofs.  All that's being done here is to change a theory of the prosecution's case.  And it's being done in such a manner that the court finds doesn't prejudice the defendant, and will require a unanimous verdict on whatever their theory is.  So the third amended information is going to be allowed.  And it's going to read count four or five, count six or seven, count eight or nine, and count ten or eleven.[2]

"A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense-a right to his day in court-are basic in our system of jurisprudence." *In re Oliver*, 333 US 257, 273; 68 S Ct 499; 92 L Ed 682 (1948).  "A defendant's right to adequate notice of the charges against the defendant stems from the Sixth Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment." *People v Darden*, 230

---

[2] The trial court instructed the jury that each of the counts had to be unanimous, so that on the CSC-I counts, the jury would have three options:  not guilty, or guilty as to one of the two alternate counts.

Mich App 597, 600; 585 NW2d 27 (1998). "[T]he constitutional notice requirement is not some abstract legal technicality requiring reversal in the absence of a perfectly drafted information. Instead, it is a practical requirement that gives effect to a defendant's right to know and respond to the charges against him." *Id.* at 601. "Whether an accused is accorded due process depends on the facts of each case." *People v McGee*, 258 Mich App 683, 700; 672 NW2d 191 (2003).

The prosecutor was entitled to amend the information in this case by way of statute and court rule. MCL 767.76 provides, in relevant part:

> The court may at any time before, during or after the trial amend the indictment in respect to any defect, imperfection or omission in form or substance or of any variance with the evidence. If any amendment be made to the substance of the indictment or to cure a variance between the indictment and the proof, the accused shall on his motion be entitled to a discharge of the jury . . .and to a reasonable continuance of the cause unless it shall clearly appear from the whole proceedings that he has not been misled or prejudiced by the defect or variance in respect to which the amendment is made or that his rights will be fully protected by proceeding with the trial or by a postponement thereof to a later day..

New offenses may not be added to an information by way of motion to amend under MCL 767.76. *People v McGee*, 258 Mich App 683, 688; 672 NW2d 191 (2003). The statute permits only corrections of defects where the defendant has been fairly apprised of the nature of the charges against him. *Id*. Thus "[a]n information may be amended at any time before, during, or after trial to cure any defect, imperfection, or omission in form or substance, including a variance between the information and the proofs, as long as the accused is not prejudiced by the amendment and the amendment does not charge a new crime." *People v Higuera*, 244 Mich App 429, 444; 625 NW2d 444, 453 (2001).

MCR 6.112(G) further provides that, "[a]bsent a timely objection *and* a showing of prejudice, a court may not dismiss an information or reverse a conviction because of an untimely filing or because of an incorrectly cited statute or a variance between the information and proof regarding time, place, the manner in which the offense was committed, or other factual detail relating to the alleged offense." (Emphasis added).

Prejudice may be shown when an amendment would force a defendant to present a different defense or evidence. *McGee*, 258 Mich App at 688. However, "[w]here a preliminary examination is held on the very charge that the prosecution seeks to have reinstated, the defendant is not unfairly surprised or deprived of adequate notice or a sufficient opportunity to defend at trial." *People v Goecke*, 457 Mich 442, 462; 579 NW2d 868 (1998). In *Goecke*, the Michigan Supreme Court concluded that the evidence introduced on charges of second-degree murder (which had been dismissed by the district court and which the prosecutor sought to reinstate) would also be used to support the charge of operating a vehicle under the influence of alcohol.

Similarly, here, the same proofs supported a charge of CSC-I for penile/vaginal penetration and penile/anal penetration. It is clear from the record that the prosecution did not seek to *add* any counts to the information and sought only to provide alternative theories for the

jury to consider. As such, an amendment only cured a defect which was already sufficiently charged and defendant was fairly apprised of the nature of the charges against him. *McGee*, 258 Mich App at 688. Even if the change "added" counts to the information, MCR 6.112(G) specifically allows such an amendment. The rule, which is procedural, supersedes the statute. *Goecke*, 457 Mich at 460.

Moreover, error in permitting an amendment of the information is not reversal error unless it resulted in a miscarriage of justice or was inconsistent with substantial justice. *McGee*, 258 Mich App at 693, citing MCL 769.26 and MCR 2.613(A). At defendant's first trial, the jury was unable to reach a unanimous verdict on the CSC-I counts and defendant has failed to show that the alleged error undermined the reliability of the verdict of first-degree home invasion. *McGee*, 258 Mich App at 693.

Because the prosecution was entitled to amend the information at any time to conform to the proofs and because the amendment did not seek to add additional charges, the trial court did not abuse its discretion when it permitted the prosecution to amend the information to provide for alternative theories.

## IV. DEFENDANT'S RIGHT TO REMAIN SILENT

In both appeals, defendant argues that he was denied his constitutional right to remain silent when the prosecutor elicited testimony from a police officer that defendant wanted to talk to an attorney. Defendant argues that he was in custody at the time he made the statement. We disagree.

"Generally, a claim of prosecutorial misconduct is a constitutional issue that is reviewed de novo, but a trial court's factual findings are reviewed for clear error." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice." *Id.* (internal citations omitted).

"We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *People v Gingrich*, ___ Mich App ___; ___ NW2d ___ (Docket No. 310416) slip op p 3.

At defendant's first trial, the following exchange took place between the prosecutor and Officer Daines:

> *Q*. Okay. How was [defendant] acting, what was his demeanor like?
>
> *A*. It went through various – you know, laughing, saying he didn't do anything, and then crying, and then going back to he doesn't care. I want to talk to my lawyer. He was doing a lot of talking. . . .
>
> *Q*. So he's running his mouth, and he's laughing and crying alternatively?
>
> *A*. Yes.

*Q*. And gives you the story about Jay and Sandra?

*A*. That quickly faded.

*Q*. Okay. Explain that.

*A*. I mean, he could tell me no more. As the evidence started piling up at the scene the story got thinner and thinner, and to the point where he just didn't want to talk about it at all until he talked to a lawyer.

*Q*. All right. And at any point at the scene did you read him his Miranda rights?

*A*. No.

Defense counsel then objected, saying "I think the prosecutor's line of questioning is improper, but I'll leave it at that." The trial court overruled the objection.

The prosecutor then asked whether Daines ever confronted "defendant about the fact that his shoe matched the print on the door." After a side bar, the trial court instructed the jury to "[d]isregard the last question." At the conclusion of the prosecutor's questions, the trial court ordered the jury out of the courtroom and explained:

> I asked the lawyers to approach for a sidebar when . . .Ms. Weingarden asked this officer whether or not the defendant was asked for an explanation about his shoe print on the door. And the reason I asked for the sidebar is because this officer previously testified that during the course of the conversation with the defendant that at some point he indicated he wanted a lawyer. And so it just wasn't clear to me at what point this question may have come up.

> \*\*\*

> Because [whether defendant was in custody] was the basis of Mr. Upshaw's objection before, or at least that's what he says at sidebar.

Defense counsel argued that the prosecutor "tainted the jury by bringing up his refusal to continued [sic] to speak after he was – told the officer he wants an attorney." The trial court found the officer's testimony to be a "non-responsive answer." The trial court asked the parties to take additional testimony from Daines out of the presence of the jury.

After the jury was excused, Daines explained that "[w]hen we got there we were asking a whole bunch of find-out questions because we didn't know what we had. Once we asked a whole bunch of find-out questions that he was willingly answering, it led up to everything that we figured out." Daines acknowledged that from the moment officers entered the apartment, defendant was not free to leave. The trial court questioned Daines:

*Q*. And there was conversation with him about how he got there?

-11-

*A.* Correct.

*Q.* Because at that point you didn't know how he got there?

*A.* Yes, that's correct.

*Q.* All right. And that's when he talked about Sandra and the other person?

*A.* Yes, sir. Can I add something?

*Q.* Sure, go ahead.

*A.* For all we knew he was at a friend's house. So it wasn't like we pointed a finger at him directly right when we got there. It was hey, what are you doing here.

*Q.* All right. And so what was the reason why you cuffed him when you put [him] in the chair?

*A.* That was after we found out that it was the home of [PL].

*Q.* Okay. So he was in the chair?

*A.* Before that he was in the chair sitting.

*Q.* Cuffed?

*A.* No, uncuffed.

*Q.* Okay. And that's when you asked him and he told you about Sandra and the other person?

*A.* Yes.

*Q.* Okay. And then you said that when you found out about [PL], that being her apartment, and you see the pill bottles is that when you cuffed him?

*A.* Yes.

*Q.* And why did you cuff him at that time?

*A.* Because then we were able to, you know, come to the determination that it was a home invasion two.

*Q.* All right. And did you ask him any questions after you cuffed him?

*A.* No. He was there sitting down while the evidence tech was there, while we were doing the investigation, so everyone – all this evidence was piling

up. And he heard everyone's comments, everyone's find-out, you know, queries, so it wasn't like – you know, it wasn't a question directed toward him, it was a comment that I threw out there so he could think. And I said – and I simply said, you're going to have a hard time explaining why the bottom of your shoe matches that footprint on the door.

*Q*. All right. Okay. And was it before or after that you threw that out that he said he wanted – wouldn't talk anymore, or wanted a lawyer?

*A*. That was after I said that.

*Q*. All right. And you did not advise him of his Miranda rights?

*A*. No.

*Q*. All right. And once he said he wanted a lawyer did you ask him any more questions or throw out any more comments?

*A*. No, sir.

The trial court determined that defendant was not in custody when he was sitting in the chair, but that he was obviously in custody at the time he was handcuffed and should have been advised of his *Miranda* rights. The trial court found that any of Daines's "side comments" to the defendant "which were obviously intended to see if they could get a response" were improper "but that question has been struck, and the witness was not allowed to answer, and so we'll go forward." Neither the prosecutor, nor defense counsel, nor the court believed a cautionary instruction would be helpful.

On the first day of defendant's second trial, defense counsel referenced Officer Daines testimony at the first trial and asked that the trial court disallow "any testimony regarding what [defendant] may have said during the questioning." Counsel asked that the trial court revisit its previous finding that defendant was not in custody prior to the time he was handcuffed, arguing that "realistically he wasn't free to go from the time he was in the chair." The trial court ruled:

All right. Just briefly, the Court is not persuaded that it should change its previous ruling in the first trial; that the questions that were initially asked of the Defendant, he was not in custody at the time.

The officers had come into the apartment. They didn't know what the situation was, whether the Defendant had a right to be there or not. If I recall correctly – cause I haven't looked at the transcript before. It was just brought up moments ago – that the Defendant was asked to sit in a chair, but other than that, his freedom wasn't – he wasn't deprived of his freedom in any meaningful way and the officers asked questions until they were able to determine that a crime had been committed and the Defendant did not have a right to be there and that's the time they placed him under arrest and placed him in handcuffs and there were no further questions asked. So the Court's going to deny the Defendant's motion to reconsider its decision.

-13-

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602, 1612; 16 L Ed 2d 694 (1966). Therefore, the Fifth Amendment prohibits a prosecutor from commenting on a defendant's silence at trial." *People v Clary*, 494 Mich 260, 265; 833 NW2d 308 (2013). "To otherwise allow the prosecutor to use an accused's silence against him at trial would place an impermissible penalty on the exercise of the accused's right against self-incrimination" because it would permit the jury to draw "an inculpatory inference." *People v Gallon*, 121 Mich App 183, 187; 328 NW2d 615 (1982). "We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation. 'Nonutterances' are not statements. The fact that a witness did not make a statement may be shown only to contradict his assertion that he did." *People v Bobo*, 390 Mich 355, 359; 212 NW2d 190 (1973). For that reason, "even in the face of specific accusation of a crime that an accused's silence may not be used against him." *Id.* at360-361. Defendant relies heavily on *Bobo* but also acknowledges that it has been significantly restricted in recent years, especially in instances in which a defendant testifies at trial. See *People v Cetlinski*, 435 Mich 742, 760; 460 NW2d 534, 542 (1990); *People v McReavy*, 436 Mich 197; 462 NW2d 1 (1990); *People v Sutton (After Remand )*, 436 Mich 575; 464 NW2d 276 (1990).

More recently, this Court has held that "[a] defendant's constitutional right to remain silent is not violated by the prosecutor's comment on his silence before custodial interrogation and before *Miranda* warnings have been given." *People v McGhee*, 268 Mich App 600, 634; 709 NW2d 595 (2005). Here, the record indicates that defendant was neither under arrest nor had he been read his *Miranda* rights. That does not necessarily end the inquiry because it must still be determined whether defendant asserted his right to silence in a custodial interrogation situation.

"[W]here the police opt to question a defendant, before advising him of his *Miranda* rights, and the questioning is investigatory and occurs in a police-dominated or police-compelled atmosphere, *Miranda* would seem to require that the defendant's responses may not be used in order to build a case against him." *People v O'Brien*, 113 Mich App 183, 195; 317 NW2d 570 (1982). However, "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by the holding of *Miranda*." *People v Dunlap*, 82 Mich App 171, 175; 266 NW2d 637 (1978). This is true because officers often act naturally and spontaneously and not every inquiry is "made pursuant to an already-launched investigation" but may be the result of a mere investigation. *Id.*

This Court has explained:

It is quite obvious that any questioning anywhere by a police officer generates some pressures and anxieties. However, before defendant's contention can be afforded substance under Miranda, the question that must be answered is whether he was in custody or deprived of his freedom of action in any significant way when the officer asked "what happened?" Therefore, it is necessary for this

Court to determine under what circumstances the statements of defendant were made.

> The question asked by the officer was not the product of a process of interrogation aimed at eliciting incriminatory statements from one whom an investigation had focused upon. Instead, it was a situation of an officer reacting naturally and spontaneously to the scene before him. It was a routine means of commencing an investigation and not an inquiry made pursuant to an already-launched investigation. The defendant had not as yet been placed under arrest; neither was he in foreign surroundings nor in a 'police-dominated atmosphere' as stressed in Miranda. [*People v Jackson*, 37 Mich App 664, 669; 195 NW2d 312 (1972).]

The *Jackson* Court looked to a case from Tennessee wherein the Tennessee appellate court found no error in admitting defendant's statement to police at the scene of the crime. Officers in that case responded to a shooting and found the victim in the defendant's apartment. Officers asked the defendant "what happened?" and the defendant replied "I shot her." *Id.* at 315. Similarly, the defendant in *Jackson* was asked "what happened?" at the scene of a shooting and this Court determined that the testimony was admissible even though he had not been mirandized because he had not been subject to a custodial interrogation.

This Court has clarified:

> The term "custodial interrogation" means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. To determine whether a defendant was in custody at the time of the interrogation, we look at the totality of the circumstances, with the key question being whether the accused reasonably could have believed that he was not free to leave. The determination of custody depends on the objective circumstances of the interrogation rather than the subjective views harbored by either the interrogating officers or the person being questioned. [*People v Zahn*, 234 Mich App 438, 449; 594 NW2d 120 (1999) (internal citations and quotation marks omitted).]

In *Zahn*, this Court found that, in suppressing the defendant's statement to police, the trial court erred in considering the officer's testimony that the defendant would not have been free to walk out of the apartment building. The Court found that "This consideration was improper. Because [the officer's] intention to prevent defendant from leaving the apartment was not conveyed to defendant, it could not have had any bearing on a defendant's understanding of the situation." Similarly, here, even though Daines testified that defendant was not free to leave PL's apartment from the moment the officers arrived, there was no indication that this was communicated to defendant. The proper focus is on defendant's perception of the situation, and not the officer's opinion about defendant's freedom to leave.

In *People v Schollaert*, 194 Mich App 158, 165; 486 NW2d 312 (1992) "when the sheriff's deputies entered defendant's home, defendant was not in a custodial interrogation situation where he was compelled to speak or to assert his right to remain silent. Although

defendant was the focus of the police investigation at that point, the relevant inquiry is whether he was subjected to police interrogation while in custody or deprived of his freedom of action in a significant way." Similarly, here, Daines testified that when officers arrived at PL's apartment, they had no idea what situation confronted them. They did not know whether defendant had a right to be there. He could have been the victim of a crime, for all they knew. The "find-out" questions to which Daines testified were natural and spontaneous questions that the officers asked as part of their initial investigation. The questions were not aimed at eliciting incriminating statements and, therefore, were not the result of an interrogation and *Miranda* was not implicated.

With regard to any comment regarding defendant's silence at the first trial, harmless error may be found when a witness's comment on a defendant's silence was unsolicited or an unresponsive answer. *Gallon*, 121 Mich App at 189. Here, the prosecutor's questioning was not "a studied attempt" to place the matter of defendant's silence before the jury. *People v Sain*, 407 Mich 412, 415; 285 NW2d 772 (1979). More importantly, at no time did the prosecutor refer to defendant's silence or argue that his desire to speak with an attorney was evidence that he had something to hide. In short, "[t]he prosecutor did not ask the jury to infer guilt from defendant's silence." *Cetlinski*, 435 Mich at 763. Further, defense counsel declined an opportunity for the trial court to give a cautionary instruction. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Additionally, there was overwhelming evidence that defendant was guilty of first-degree home invasion. He was found passed out in PL's apartment, whose door had been kicked in. It appears that the jury had no trouble convicting defendant of first-degree home invasion and struggled only with the CSC counts, undoubtedly because of PL's confusing and inconsistent testimony during trial.

With regard to defendant's statements at his second trial – that he and his friends were at PL's apartment and that PL was there before defendant passed out – the statements were not the result of a custodial interrogation and, therefore, did run afoul of *Miranda*.

V. JUROR QUESTIONS

In Docket No. 314335, defendant argues that due process requires a new trial because the jurors were actively involved in "filling in any perceived gaps in the prosecutor's proofs, and in deliberating before the conclusion of the case." We disagree.

A trial court's decision to allow juror questions is reviewed for an abuse of discretion. *People v Heard*, 388 Mich 182, 188; 200 NW2d 73 (1972). Defendant's claim that allowing the jury to participate in questioning witnesses resulted in a denial of due process is a constitutional question that this Court reviews de novo. *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999).

MCR 2.513(I) provides:

Juror Questions. The court may permit the jurors to ask questions of witnesses. If the court permits jurors to ask questions, it must employ a procedure that ensures that such questions are addressed to the witnesses by the court itself, that

-16-

inappropriate questions are not asked, and that the parties have an opportunity outside the hearing of the jury to object to the questions. The court shall inform the jurors of the procedures to be followed for submitting questions to witnesses.

The practice of allowing jurors to ask questions was sanctioned by *People v Heard*, 388 Mich 182; 200 NW2d 73 (1972):

> The practice of permitting questions to witnesses propounded by jurors should rest in the sound discretion of the trial court. It would appear that in certain circumstances, a juror might have a question which could help unravel otherwise confusing testimony. In such a situation, it would aid the fact-finding process if a juror were permitted to ask such a question. We hold that the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court. The trial judge may permit such questioning if he wishes, and we hold that it was error for the judge to rule that under no circumstances might a juror ask any questions. [*Id.* at 187-188.]

The court rule thus embodies *Heard's* holding. We decline defendant's invitation to follow the Minnesota Supreme Court's decision in *State v Costello*, 646 NW2d 204, 215 (Minn, 2002). This Court is not bound by the decisions of courts of other states; rather, it is bound by the Supreme Court's holding in *Heard* and the court rule. *People v Jackson*, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011).

The trial court followed proper procedure.

## VI. SENTENCING ERRORS

Finally, in Docket No. 314335, defendant argues that the trial court violated his due process rights by scoring sentencing guideline offense variables (OV) and determining defendant's minimum sentence based on disputed facts that the prosecutor did not charge and prove beyond a reasonable doubt to the jury. We disagree.

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013) (internal footnotes omitted.)]

Defendant argues that the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by engaging in judicial fact-finding that raised his minimum sentence in violation of the United States Supreme Court's decision in *Alleyne v United States* ___ US ___; 133 S Ct 2151; 186 L Ed 2d 314 (2014). However, in *Herron*, 303 Mich App 392, 405; 845 NW2d 533 (2013), this Court held that *Alleyne* does not apply to Michigan's legislative sentencing guidelines:

We hold that judicial fact-finding to score Michigan's guidelines falls within the wide discretion accorded a sentencing judge in the sources and types of evidence used to assist the court in determining the kind and extent of punishment to be imposed within limits fixed by law. Michigan's sentencing guidelines are within the broad sentencing discretion, informed by judicial factfinding, that does not violate the Sixth Amendment. [Internal quotation marks and citations omitted.]

Defendant acknowledges that his argument has been rejected in *People v Herron,* 303 Mich App 392; 845 NW2d 392 (2013) but raises the issue "for possible Michigan Supreme Court review."

Even if the Court was not bound by *Herron*, defendant's arguments have no basis in law or fact.

MCL 777.37(1) provides that 50 points are to be scored when "a victim was treated with sadism, torture, or excessive brutality or conduct designed to substantially increase the fear and anxiety a victim suffered during the offense." The statute specifically defines "sadism" as "conduct that subjects a victim to extreme or prolonged pain or humiliation and is inflicted to produce suffering or for the offender's gratification." MCL 777.37(3). The Supreme Court has held that:

 a defendant's conduct does not have to be "similarly egregious" to "sadism, torture, or excessive brutality" for OV 7 to be scored at 50 points, and that, absent an express statutory prohibition, courts may consider circumstances inherently present in the crime when scoring OV 7. The relevant inquiries are (1) whether the defendant engaged in conduct beyond the minimum required to commit the offense; and, if so, (2) whether the conduct was intended to make a victim's fear or anxiety greater by a considerable amount. [*Hardy*, 494 Mich at 443-444.]

At defendant's second sentencing, the trial court acknowledged that it declined to score 50 points for OV 7 at defendant's original sentencing when he was sentenced for home invasion. However, the trial court stated:

I think under the circumstances, in light of the fact that he has been convicted now of Criminal Sexual Conduct in the First Degree, that changes the Court's analysis.

Based on her testimony, during the course of the assault, there was testimony that he told her he was going to kill her and that he did repeatedly hit and punch her in the face and kick her and called her names, told her she smelled like do-do.

It was clear from her testimony and the Court having watched her testify twice now, and the manner in which she testified, that this did subject her to extreme or prolonged, in particular, humiliation.

It is sufficient to score him 50 points for the purpose of OV 7.

The trial court did not err in scoring OV 7 where defendant exercised more physical abuse than was necessary to carry out the rape, beating PL.

As for OV 10, MCL 777.40(1) provides that 10 points are to be scored if "The offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." The trial court in this case stated:

> I find that the prosecution has provided sufficient evidence on this point based on the trial evidence that she was developmentally disabled, that he exploited this, that he was with her for a period of time.
>
> Her mental disability was apparent to the Court. Since the Defendant was with her for a period of time, the Court is convinced, by a preponderance of the evidence, that it would have been apparent to him as well.
>
> I think by the conduct toward her in terms of telling her she smelled like do-do and other things, that he exploited that as well as her physical abilities based on her weight, difficulty moving . . ..
>
> So I am going to score OV 10 at 10 points.

On appeal, defendant seems to argue that because defendant was convicted of CSC-I under MCL 750.520b(1)(c) (sexual penetration occurs under circumstances involving the commission of any other felony) as opposed to MCL 750.520b(g) (mental incapacity of the victim) the trial court was precluded from considering PL's obvious cognitive impairments. Defendant had already been convicted of first-degree home invasion at his first trial. Therefore, at the second trial, the "other felony" (first-degree home invasion) was a foregone conclusion and the jury only needed to determine whether defendant committed a sexual assault at the time of the home invasion. It would be absurd to preclude a trial court from considering the aggravating circumstances surrounding the crime. PL was clearly suffering from a diminished intellectual capacity, as evidenced by her testimony at both trials. She was an older woman who lived alone in a basement apartment. The trial court did not err in scoring OV 10 at 10 points for defendant's exploitation of PL's vulnerability.

Adequate record evidence existed to support the trial court's assessment of points on the challenged offense variables.

Affirmed.

/s/ Christopher M. Murray
/s/ Henry William Saad
/s/ Kirsten Frank Kelly